980 So.2d 460 (2008)
Leroy POOLER, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-2191.
Supreme Court of Florida.
January 31, 2008.
Rehearing Denied April 17, 2008.
*462 Matthew D. Bavaro and Bradley M. Collins of Bradley M. Collins, P.A., Fort Lauderdale, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, Florida, and Lisa-Marie Lerner and Leslie T. Campbell, Assistant Attorneys General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Leroy Pooler appeals an order of the circuit court denying his motion to vacate his first-degree murder conviction and sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons set forth in this opinion, we affirm the trial court's denial of Pooler's motion.

FACTS AND PROCEDURAL HISTORY
On direct appeal, this Court summarized the facts of this case as follows:
Leroy Pooler was convicted of first-degree murder for the shooting death of his ex-girlfriend, Kim Wright Brown. He also was convicted of burglary and attempted first-degree murder with a firearm. The facts supporting these convictions are as follows. On January 28, 1995, Carolyn Glass, a long-time acquaintance of Kim Brown, told her that Pooler had said he was going to kill her because if he could not have her, no one else would. (Evidence showed that Kim Brown had begun seeing another man.) Two days later, Pooler knocked on the front door of the apartment where Kim and her younger brother, Alvonza Colson, lived with their mother. Seeing Pooler through the door window, Kim told him that she did not want to see him anymore. Alvonza opened the door halfway and asked Pooler what he wanted but would not let him in. When Pooler brandished a gun, Alvonza let go of the door and tried to run out the door, but he was shot in the back by Pooler. Pooler pulled Alvonza back into the apartment by his leg. Kim begged Pooler not to kill her brother or her and began vomiting into her hands. She suggested they take Alvonza to the hospital. Pooler originally agreed but then told Alvonza to stay and call himself an ambulance while Pooler left with Kim. However, rather than follow Pooler out the door, Kim shut and locked it behind him. Alvonza told Kim to run out the back door for her life while he stayed in the apartment to call for an ambulance. When he discovered that the telephone wires had been cut, he started for the back door, just as Pooler was breaking in through the front entrance.
Pooler first found Alvonza, who was hiding in an area near the back door, but when he heard Kim yelling for help, he left Alvonza and continued after Kim. When he eventually caught up with her, he struck her in the head with his gun, causing it to discharge. In front of numerous witnesses, he pulled her toward his car as she screamed and begged him not to kill her. When she fought against going in the car, Pooler pulled her back toward the apartment building and shot her several times, pausing once to say, "You want some more?" Kim had been shot a total of five times, including once *463 in the head. Pooler then got into his car and drove away.
The jury recommended death by a vote of nine to three. The trial court found the following aggravators: (1) that the defendant had a prior violent felony conviction (contemporaneous attempted first-degree murder of Alvonza); (2) that the murder was committed during the commission of a burglary; and (3) that the murder was heinous, atrocious, or cruel. The trial court found as statutory mitigation that the crime was committed while Pooler was under the influence of extreme mental or emotional disturbance, but gave that finding little weight. . . .
As nonstatutory mitigation, the trial court found the defendant's honorable service in the military and good employment record, as well as the fact that he was a good parent, had done specific good deeds, possessed certain good characteristics, and could be sentenced to life without parole or consecutive life sentences. The only mitigator given considerable weight was Pooler's honorable military service; the others were given some to little weight. . . . Concluding that each of the three aggravators standing alone would outweigh the mitigating evidence, the court sentenced Pooler to death.
Pooler v. State, 704 So.2d 1375, 1377 (Fla. 1997). On direct appeal, this Court affirmed Pooler's convictions and sentences.[1]
Pooler subsequently filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850, in which he raised sixteen claims.[2] The trial court *464 held an evidentiary hearing on three of them and subsequently denied relief on all claims.

ANALYSIS
Pooler raises two issues on appeal: (A) trial counsel provided constitutionally ineffective assistance; and (B) the trial court erred in summarily denying nine of his postconviction claims. We address these issues in turn.

A. Ineffective Assistance of Counsel
Pooler argues that his trial counsel was constitutionally ineffective for (1) failing to investigate and present a voluntary intoxication defense; (2) failing to investigate and present evidence of alcohol abuse or dependency in support of the impaired capacity mitigator; (3) failing to investigate and present Pooler's school, military, and employment records in mitigation; and (4) failing to retain adequate mental health experts and provide them with the necessary background information to render competent opinions. In Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court established a two-prong standard for determining whether counsel provided constitutionally ineffective assistance. First, a defendant must demonstrate that counsel's performance was deficient by pointing to specific acts or omissions of counsel that are "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687, 104 S.Ct. 2052; see also Marshall v. State, 854 So.2d 1235, 1247 (Fla.2003) ("Under Strickland, `counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'") (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052). Second, the defendant must establish prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. Because both prongs of the Strickland test present mixed questions of law and fact, this Court employs a mixed standard of review, deferring to the circuit court's factual findings that are supported by competent, substantial evidence but reviewing the circuit court's legal conclusions de novo. See Sochor v. State, 883 So.2d 766, 771-72 (Fla.2004).

1. Failure to Investigate and Present a Voluntary Intoxication Defense[3]
Pooler claims that defense counsel, Michael Salnick, was ineffective for failing to investigate and present a voluntary intoxication defense. At the evidentiary hearing, Pooler introduced evidence relating to his alcohol use. The evidence included a police report made by Pooler two to three hours before the murder alleging that someone stole $301 from him while he was asleep in his vehicle due to intoxication. Detective Frank Alonzo of the *465 West Palm Beach Police Department, who made the police report, testified that although Pooler smelled of alcohol at the time he came to the police department, he did not appear intoxicated, did not slur his speech, and answered all questions. Because Pooler did not seem intoxicated, Detective Alonzo did not prevent him from getting into his car and driving after making the report. Pooler also presented two handwritten letters authored by his nephews, Brian and Darren Warren, attesting to Pooler's alcohol problem. Brian's letter stated, "On the morning of the shooting . . . Leroy called me [and] told me he knew Kim had been killed but he could not remember what happened. He was very upset and it seemed he was still drunk." Both nephews stated that they would have testified at trial but were not contacted by Pooler's defense team. The postconviction trial court denied this claim because the evidence did not support a voluntary intoxication defense and because Pooler thwarted any possibility of raising this defense when he refused to admit to shooting Kim Brown.
We affirm the trial court's order. Although the evidence presented at the evidentiary hearing suggests that Pooler may have had a history of alcohol abuse and may have been drinking the night before and soon after the murder, none of the evidence establishes that he was intoxicated at the time of the murder. Indeed, the testimony of Detective Alonzo establishes that Pooler was not intoxicated just a few hours before the murder. Pooler presented no evidence that he became intoxicated between the time he left the police department and the time he arrived at Kim Brown's house. Accordingly, he failed to establish any reasonable basis upon which to assert the affirmative defense of voluntary intoxication. See Reaves v. State, 826 So.2d 932, 938-39, n. 9 (Fla.2002) (holding that in order to successfully assert the defense of voluntary intoxication, the defendant must come forward with evidence of intoxication at the time of the offense sufficient to establish that he was unable to form the intent necessary to commit the crime charged).
Moreover, Salnick made a reasonable tactical decision not to pursue a voluntary intoxication defense. See Rivera v. State, 717 So.2d 477, 485 (Fla.1998) (holding that trial counsel made a reasonable tactical decision to forego a voluntary intoxication defense because "there was no evidence that Rivera was intoxicated at the time of the murder"). Salnick testified that he considered a possible voluntary intoxication defense but chose not to present it because Pooler could recall specific details regarding the day of the murder and because neither Pooler nor any of his family members mentioned that Pooler had a history of alcoholism or that he was intoxicated at the time of the murder.
Additionally, the trial court found, based on competent, substantial evidence, that Pooler refused to participate in any defense that required him to admit that he did the shooting. Counsel was thus prevented from asserting the voluntary intoxication defense. See Rivera, 717 So.2d at 485 (holding that counsel's performance was not deficient because "Rivera's unwavering professions of innocence short-circuited any credible voluntary intoxication defense during the guilt phase"); Rose v. State, 617 So.2d 291, 294 (Fla.1993) ("When a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made.") (quoting Mitchell v. Kemp, 762 F.2d 886, 889 (11th Cir. 1985)). Pooler denies that he refused to admit to the killing. However, a memorandum from Salnick to Pooler on the eve of trial confirms that Pooler ultimately rejected a plea deal for a life sentence, refused *466 to admit to shooting Kim, and directed Salnick to pursue a sufficiency of the evidence strategy. In light of this evidence, we defer to the trial court's factual finding and affirm its conclusion that Salnick was not ineffective in foregoing a voluntary intoxication defense because it would have undermined Pooler's chosen defense strategy. See Freeman v. State, 858 So.2d 319, 323 (Fla.2003) (holding that while the performance and prejudice prongs are mixed questions of law and fact subject to a de novo standard, deference is given to the trial court's factual findings which are supported by competent, substantial evidence).
Pooler failed to prove any deficiency in Salnick's performance in regard to this issue. In light of this failure, we need not address the prejudice prong. See Strickland, 466 U.S. at 697, 104 S.Ct. 2052 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); Downs v. State, 740 So.2d 506, 518 n. 19 (Fla.1999) (finding no need to address prejudice prong where defendant failed to establish deficient performance element).
2. Failure to Investigate and Present Evidence of Alcohol Abuse or Dependency in Support of the Impaired Capacity Mitigator
Pooler next argues that counsel was ineffective for failing to investigate and present evidence of his history of alcohol abuse and dependency in support of the impaired capacity mitigator. See Stewart v. State, 558 So.2d 416 (Fla.1990). As evidence, Pooler cites the police report he made hours before the murders, the testimony of Detective Alonzo, and the letters from his nephews, Brian and Darren Warren. In addition, Pooler's postconviction expert, Dr. Michael Brannon, testified that he diagnosed Pooler with alcohol dependency disorder and hepatitis C. The postconviction trial court denied this claim because Salnick conducted a reasonable investigation and successfully prevented the State from obtaining an instruction on the cold, calculated, and premeditated (CCP) aggravating circumstance by introducing evidence during the penalty phase that Pooler had been drinking two days before the murder when he threatened to kill Kim Brown.
We affirm the trial court's conclusion. First, Salnick's performance was not deficient. As stated earlier, Salnick conducted a reasonable investigation into Pooler's background. Neither Pooler nor his family indicated to Salnick that he had a substance abuse problem or that he had been drinking at the time of the shooting. However, Salnick discovered that Pooler had been drinking two days before the murder when he threatened to kill Kim Brown. He used this information during the penalty phase to prevent the State from obtaining an instruction on CCP. Further, Salnick testified at the evidentiary hearing that he chose not to introduce Pooler's police report during the penalty phase because it would open the door for the State to cross-examine Pooler regarding the fact that he had been with a prostitute when he passed out drunk and that she stole his money. This was a reasonable tactical decision made after a reasonable investigation; therefore, Salnick's performance was not deficient. See Occhicone v. State, 768 So.2d 1037, 1048 (Fla. 2000) ("[S]trategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."). Moreover, as discussed earlier, none of the evidence introduced by Pooler at the evidentiary hearing shows *467 that he was intoxicated at the time of the murder. Therefore, any alleged failure on Salnick's part to investigate and present it at trial was not prejudicial.

3. Failure to Investigate and Present School, Military, and Employment Records in Mitigation
Pooler next claims that Salnick was ineffective for failing to investigate and present his school, military, and employment records in mitigation. According to Pooler, counsel could have used the information contained in these records to mitigate his sentence by showing that Pooler had dull intelligence and a troubled background. At the postconviction evidentiary hearing, Pooler's collateral counsel introduced his military, school, and employment records. Pooler's military records revealed that he was charged with at least nineteen different offenses on fifteen different occasions between October 1969 and February 1971 and that he was court-martialed for several of these offenses. His school records show that he was an average student in early elementary school, but that his grades grew progressively worse each year. Some of Pooler's teachers commented that he was "very slow" and "mischievous," that he "play[s] hooky," "does not attend school regularly," "is not interested in school," "need[s] guidance," and "may get with the wrong crowd easily." Pooler failed multiple grades and ultimately never graduated from high school. In addition, Pooler's employment records indicate that he had been employed as a refuse worker and quit without notice. Notwithstanding Salnick's failure to obtain these records, the postconviction trial court concluded that he conducted a reasonable investigation, noting that when written documentation was not available, Salnick found alternate means to corroborate Pooler's statements regarding his background (i.e., interviews with Pooler's family members).
We affirm the trial court's conclusions. Salnick conducted a reasonable investigation. His failure to obtain Pooler's records does not rise to the level of ineffective assistance. Pooler consistently represented to Salnick that he was an average student, graduated from high school, and was honorably discharged from the Marine Corps. To test the validity of Pooler's representations, Salnick's investigator, Marvin Jenne, traveled to Louisiana and interviewed members of Pooler's family. All of the family members Jenne located and interviewed corroborated Pooler's positive representations. Further, Jenne made an attempt, albeit unsuccessful, to obtain Pooler's school records. Based on Pooler's positive representations of himself which were substantiated by his family members, Salnick had no reason to believe Pooler's records would contain anything negative or mitigating. See Rompilla v. Beard, 545 U.S. 374, 383, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). Therefore, he formed a reasonable trial strategy of presenting Pooler in a positive light.
Moreover, no prejudice resulted from counsel's choice of strategy. At trial, Salnick showed that Pooler had been a productive member of society and crime-free for fifteen years prior to the murder. He presented evidence that Pooler had served honorably in the military in Vietnam, reenlisted, raised a daughter, took care of his relatives, was a good parent, worked at the same job for eight years, and was well liked by his coworkers. Of all the mitigation presented, the trial court gave considerable weight only to Pooler's honorable *468 military service. Had Salnick introduced Pooler's military, school, or employment records, he would have undermined Pooler's only significant mitigation. See Reed v. State, 875 So.2d 415, 437 (Fla.2004) ("An ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword."). Furthermore, Pooler's records would not have opened up mitigation leads sufficient to overcome the aggravation found by the trial court. Accordingly, counsel's failure to obtain these records does not undermine confidence in Pooler's death sentence.
4. Failure to Retain Adequate Mental Health Experts and Provide Them with the Necessary Background Information to Render Competent Opinions
Pooler next claims that counsel was ineffective for failing to retain adequate mental health experts and provide them with the necessary background information to render competent opinions. Specifically, Pooler argues that counsel rendered ineffective assistance by retaining as penalty phase mental health experts two court-appointed doctors who evaluated Pooler solely for competency prior to trial and two psychiatrists who treated Pooler while he was in jail.
The record reveals that Drs. Stephen Alexander and Laurence Levine evaluated Pooler for competency prior to trial and testified at his competency hearing. At the pretrial competency hearing, Dr. Alexander questioned Pooler's ability to understand courtroom procedures and to communicate sufficiently with counsel, ultimately concluding that Pooler was not competent to stand trial. He estimated that Pooler's IQ was between 75 and 85 and found that Pooler was not suffering from any undue stress, mental illness, or personality disorder. Dr. Levine also expressed concern regarding Pooler's ability to assist his attorney in preparing a defense and in challenging the State's witnesses. He found Pooler to be of borderline intelligence and noted inconsistencies in the information Pooler gave him versus his test results. However, Dr. Levine ultimately determined that Pooler was competent to stand trial. Based on this testimony, the trial court determined that Pooler had an IQ of 80 and was competent to stand trial.
During the penalty phase, Salnick called Drs. Levine and Alexander as defense mental health experts. They provided the same information regarding the results of their competency evaluations as they did at Pooler's competency hearing. Dr. Alexander further opined that Pooler's capacity to appreciate the criminality of his conduct or to conform to the requirements of the law was not impaired. In addition, Salnick elicited testimony from Drs. Michael Armstrong and Jude Desormeau, who treated Pooler while in jail. Dr. Armstrong testified that Pooler was depressed, complained of hearing a voice in his head, stated that he had no reason to live, and felt like he was going to explode. He diagnosed Pooler as suffering from judgment disorder with emotional features. Dr. Desormeau testified that he examined Pooler while in jail because he was a suicide risk. He was not aware that Pooler claimed to be hearing voices but testified that Pooler was suffering from depression as a result of his murder charge.
At the postconviction evidentiary hearing, Pooler presented the testimony of Dr. Brannon, who tested Pooler for competency prior to the hearing and conducted a forensic mental health evaluation for the purpose of mitigation. Dr. Brannon ultimately concluded that Pooler was competent to proceed. However, Dr. Brannon testified that Pooler had a borderline retarded *469 IQ of 75 and that he suffered neurological damage from head injuries. Pooler did not call any of his trial experts to testify at the evidentiary hearing. Following the hearing, the postconviction trial court denied this claim, concluding that the expert testimony presented by Salnick met the requirements of Strickland and Ake v. Oklahoma, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (holding that a defendant must have access to a "competent psychiatrist [or other mental health professional] who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense").
We affirm the trial court's denial of this claim. As explained earlier, Salnick reasonably relied on Pooler's corroborated representations regarding his scholastic and military background. See Wiggins v. Smith, 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ("Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing."). Salnick communicated this information to the experts, and Pooler also gave the experts the same information during their evaluations of him. Furthermore, Salnick testified at the evidentiary hearing that he retained these experts because, given their neutrality, they would be more credible and difficult to impeach. This was a reasonable strategic decision. See Occhicone, 768 So.2d at 1048.
Even if we assume counsel's decision to forego further testing constituted deficient performance, Pooler failed to establish that any prejudice resulted from it. He presented no evidence that the defense experts were incompetent or that they failed to assist in the evaluation, preparation, and presentation of the defense. See Jones v. State, 845 So.2d 55, 67-68 (Fla. 2003). Nor did Pooler identify anything of substance that a more in-depth psychoanalysis would have added. Dr. Brannon's finding that Pooler had neurological damage from head injuries was already indicated in Dr. Levine's evaluation. Also, Dr. Brannon's determination that Pooler had a borderline retarded IQ of 75 does not constitute a clear indication of actual mental retardation because it is within the range estimated by Dr. Alexander and is not substantially inconsistent with the trial court's finding that Pooler had an IQ of 80. Furthermore, because Pooler did not call any of his trial experts to testify at his postconviction hearing, he failed to demonstrate that they would have changed their opinions had they conducted more in-depth psychological evaluations or been provided with his records. Under these circumstances, a new sentencing proceeding is not mandated. See State v. Sireci, 502 So.2d 1221, 1224 (Fla.1987) ("[A] new sentencing hearing is mandated in cases which entail psychiatric examinations so grossly insufficient that they ignore clear indications of either mental retardation or organic brain damage.").

B. Summarily Denied Claims
Pooler also asserts that the circuit court erred in summarily denying nine of his postconviction claims. We disagree and affirm the trial court's order. Generally, a defendant is entitled to an evidentiary hearing on a postconviction relief motion unless "(1) the motion, files, and records in the case conclusively show that the [defendant] is entitled to no relief, or (2) the motion or a particular claim is legally insufficient." Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000); accord Fla. R.Crim. P. 3.850(d).[4] In such a case, *470 "[t]he defendant bears the burden of establishing a prima facie case based upon a legally valid claim. Mere conclusory allegations are not sufficient to meet this burden." Freeman, 761 So.2d at 1061. However, when reviewing a court's summary denial of an initial rule 3.850 motion filed in a capital case, the Court will affirm the ruling only if the State has shown that the motion is legally flawed or that the record conclusively demonstrates that the defendant is entitled to no relief. See Patton v. State, 784 So.2d 380, 386 (Fla.2000). This Court must accept Pooler's allegations as true "to the extent they are not refuted by the record." Peede v. State, 748 So.2d 253, 257 (Fla.1999). We briefly address each claim.

Age, Low IQ, and Good Jail Behavior Mitigators
Pooler asserts that the postconviction trial court erred in summarily denying his claim that his trial counsel failed to investigate and present, and the trial court failed to find, the age, low IQ, and good jail behavior mitigators. The postconviction trial court summarily denied this claim as procedurally barred because it was raised and rejected by this Court on direct appeal. We affirm the trial court's summary denial of this claim. See Pooler, 704 So.2d at 1379-80 (holding that the sentencing court's failure to find these mitigators was either not an abuse of discretion or harmless error); see also Spencer v. State, 842 So.2d 52, 60-61 (Fla.2003) (quoting Smith v. State, 445 So.2d 323, 325 (Fla.1983) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.")).

1. Misleading Comments and Jury Instructions
Pooler next argues that the postconviction trial court erred in summarily denying his claim that the jury was misled by (1) the trial court's repeated instructions that the jury's sentencing role was merely advisory; (2) the trial court's instructions and the State's argument which, Pooler claims, shifted the burden to Pooler to prove that death was an inappropriate sentence; and (3) the trial court's instructions that Pooler claims were unconstitutionally vague and allowed the jury to consider the murder in the course of a felony aggravator as an automatic aggravator. Pooler also argues that trial counsel was ineffective for failing to object to these comments and instructions. The postconviction trial court summarily denied these claims as both procedurally barred and legally insufficient.
We affirm the trial court's decision. Pooler's claims of prosecutorial misconduct and trial court error should have been raised on direct appeal. See Rodriguez v. State, 919 So.2d 1252, 1262 n. 7, 1280 (Fla.2006); Occhicone, 768 So.2d at 1040 n. 3. ("[C]laims challenging the validity of jury instructions should be raised on direct appeal, not on motions for postconviction relief."). Similarly, Pooler's claims regarding the adequacy of jury instructions are procedurally barred because they should have been raised on direct appeal. See Thompson v. State, 759 So.2d 650, 665 (Fla.2000). We will not consider such procedurally barred claims under the guise of ineffective assistance of counsel. See Freeman, 761 So.2d at 1067 (holding that claims that could have been raised on direct appeal cannot be relitigated under the guise of ineffective assistance of counsel). *471 Moreover, Pooler's ineffectiveness claim for failure to object to these jury instructions is legally insufficient. The instructions were proper and were consistent with the standard jury instruction. See Rodriguez, 919 So.2d at 1280-81 (rejecting claims that jury instructions diluted the jury's responsibility for its sentencing role, shifted the burden to the defendant to prove that death was inappropriate, and allowed the jury to consider the murder in the course of a felony aggravator as an automatic aggravator); Griffin v. State, 866 So.2d 1, 14 (Fla.2003) (rejecting claim that the murder in the course of a felony aggravating circumstance allows the jury to consider an automatic aggravator in recommending whether to impose a death sentence); Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002) (rejecting claim that the standard jury instruction impermissibly shifted the burden to the defense to prove that death was not the appropriate sentence); see also Cherry v. State, 781 So.2d 1040, 1054 (Fla.2000) ("[C]ounsel cannot be deemed ineffective for failing to object to proper jury instructions.").

3. Counsel's Failure to Investigate Forensic Evidence and Obtain Proper Forensic Experts
Next, Pooler claims that the trial court erred in summarily denying his claim that trial counsel was ineffective for failing to investigate forensic evidence and for failing to obtain proper forensic experts. Pooler argues that he was prejudiced because a well-informed, independent medical expert could have opined that the victim died instantaneously and, thus, the heinous, atrocious, or cruel (HAC) aggravating factor would not have applied. The trial court summarily denied this claim as legally insufficient because Pooler failed to identify what evidence or expert opinion his trial counsel could have offered to show that the victim's death was instantaneous so as to refute the HAC finding.
We affirm the trial court's conclusion. This claim is legally insufficient because Pooler fails to identify what evidence or expert opinion his trial counsel could have offered to show that the victim's death was instantaneous. Moreover, even if forensic evidence could have shown that the victim's death was instantaneous, we would not strike the HAC aggravator. As we held on direct appeal, "the fear, emotional strain, and terror of the victim during the events leading up to the murder" support the trial court's HAC finding, "even where the victim's death was almost instantaneous." See Pooler, 704 So.2d at 1378.

4. Counsel's Failure to Object to the Introduction of Gruesome Photographs
Pooler further asserts that the trial court erred in summarily denying his claim that counsel rendered ineffective assistance by failing to object to the State's introduction of gruesome photographs. The postconviction trial court determined that this claim is legally insufficient because counsel raised a timely, albeit unsuccessful, objection to the admission of the photographs in question.
We affirm the trial court's decision. The record conclusively shows that Salnick's performance was not deficient because he challenged the admission of the photographs by written motion when they were offered into evidence by the State. Even if counsel had failed to sufficiently object, it is clear that no prejudice resulted because the trial court did not abuse its discretion in admitting the photographs. See Pangburn v. State, 661 So.2d 1182, 1187 (Fla.1995) ("[T]he admission of photographic evidence is within the trial judge's discretion and a trial judge's ruling on this *472 issue will not be disturbed on appeal unless there is a clear showing of abuse."). Each photograph depicted a different wound and none appeared particularly gory. See Rose v. State, 787 So.2d 786, 794 (Fla.2001) ("[A]utopsy photographs, even when difficult to view, are admissible to the extent that they fairly and accurately establish a material fact and are not unduly prejudicial."); Czubak v. State, 570 So.2d 925, 928 (Fla.1990) (holding that photographs are admissible if they are "relevant and not so shocking in nature as to defeat the value of their relevance"); see also Larkins v. State, 655 So.2d 95, 98 (Fla.1995) (upholding the admission of photographs where they are relevant to "explain a medical examiner's testimony, to show the manner of death, the location of wounds, and the identity of the victim").

5. Juror Interviews
Next, Pooler argues that the trial court erred in summarily denying his claim that the rule prohibiting juror interviews is unconstitutional. The trial court summarily denied this claim, determining that it was both procedurally barred because it was not raised on direct appeal and meritless because Pooler failed to make a prima facie case of jury misconduct. We agree. This claim is procedurally barred because it should have been raised on direct appeal. See Rodriguez, 919 So.2d at 1262 n. 7. It is also legally insufficient as this Court has previously rejected similar constitutional challenges to Florida Rule of Professional Conduct 4-3.5(d)(4). See Power v. State, 886 So.2d 952, 957 (Fla. 2004); State v. Duncan, 894 So.2d 817, 826 & n. 7 (Fla.2004); Johnson v. State, 804 So.2d 1218, 1224 (Fla.2001). Moreover, Pooler did not state a prima facie case of jury misconduct. See Johnson, 804 So.2d at 1225 ("[J]uror interviews are not permissible unless the moving party has made sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceeding[]."). Without more than what was pled, this claim is nothing more than an impermissible fishing expedition after a guilty verdict has been returned. See Griffin v. State, 866 So.2d 1, 20 (Fla.2003); Arbelaez v. State, 775 So.2d 909, 920 (Fla. 2000).

6. Innocent of the Death Penalty
Pooler further contends that the trial court erred when it summarily denied his claim that he is innocent of the death penalty due to a lack of valid aggravating circumstances. The trial court summarily denied this claim because the record revealed that Pooler failed to demonstrate that none of the aggravators apply.
We affirm the trial court's summary denial of this claim. We determined the validity of the prior violent felony and HAC aggravators on direct appeal. Pooler, 704 So.2d at 1378-79, 1381. Pooler does not successfully challenge these aggravators in his postconviction motion. Therefore, Pooler fails to present "evidence that an alleged constitutional error implicates all of the aggravating factors found to be present by the sentencing body." Johnson v. Singletary, 938 F.2d 1166, 1183 (11th Cir.1991).

7. Florida's Death Penalty is Unconstitutionally Vague
Pooler next asserts that the trial court erred in summarily denying his claim that Florida's capital sentencing scheme is unconstitutionally vague because it fails to provide a standard of proof for determining that the aggravating circumstances outweigh the mitigating circumstances and because the statute does not sufficiently define each aggravating circumstance. The trial court denied this claim as procedurally barred because Pooler unsuccessfully *473 challenged the constitutionality of Florida's death penalty statute on direct appeal. We affirm the trial court's denial of this claim. Pooler, 704 So.2d at 1380-81; see also Rodriguez, 919 So.2d at 1262 n. 7 (holding that Rodriguez's claim concerning the constitutionality of the death penalty was procedurally barred because it was raised and rejected on direct appeal); Muhammad v. State, 603 So.2d 488, 489 (Fla.1992) ("Issues which either were or could have been litigated at trial and upon direct appeal are not cognizable through collateral attack.").

8. Florida's Death Penalty Statute Violates Ring

Pooler further contends that the trial court erred in summarily denying his claim that Florida's death penalty statute is unconstitutional in light of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We affirm the trial court's denial of this claim. See Johnson v. State, 904 So.2d 400, 412 (Fla.2005).

9. Cumulative Error
Lastly, Pooler argues that the trial court erred in summarily denying his claim that the number and types of error that occurred cumulatively prevented him from receiving a constitutionally adequate trial. This claim is legally insufficient. See Griffin, 866 So.2d at 22 ("[W]here individual claims of error alleged are either procedurally barred or without merit, the claim of cumulative error must fail."); accord Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999).

CONCLUSION
For the foregoing reasons, we affirm the circuit court's order denying Pooler's motion for postconviction relief.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] On direct appeal, Pooler raised the following issues: (1) the prosecutor made improper comments during voir dire; (2) the trial court failed to instruct the jury on attempted first-degree felony murder; (3) the trial court erred in finding the heinous, atrocious, or cruel (HAC) aggravator; (4) the trial court erred in finding the prior violent felony aggravator; (5) Pooler lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the law; (6) Pooler was under extreme duress or the substantial domination of another person at the time the murder was committed; (7)-(11) the trial court erred in rejecting the nonstatutory mitigators, including extreme duress, good jail record/ability to adapt to prison life, low-normal intelligence, rehabilitable, and heated domestic dispute; (12) the record on appeal did not contain the presentence investigation (PSI) report relied upon by the trial court in rejecting nonstatutory mitigation; (13) the trial court erred in departing from the sentencing guidelines without issuing a written contemporaneous departure order for the offenses of attempted first-degree murder with a firearm and burglary of a dwelling while armed; (14) Florida's death penalty is unconstitutional; and (15) Pooler's death sentence is disproportionate.
[2] In his postconviction motion, Pooler claimed the following: (1) trial counsel failed to investigate and present a voluntary intoxication defense; (2) trial counsel failed to properly investigate and present mitigation (lack of capacity, age, dull intelligence, mental health problems, intoxication, impoverished background, good jail record, good parent, and remorse); (3) trial counsel failed to investigate and present, and trial court failed to find, mitigation (good jail behavior, low IQ, and age); (4) the sentencing jury was misled by comments and instructions which diluted its sense of responsibility for sentencing; (5) the penalty phase jury instructions shifted the burden to Pooler to prove that death was inappropriate; (6) trial counsel failed to obtain an adequate mental health evaluation and failed to provide the necessary background information to the mental health consultants; (7) Pooler's sentence rests upon an unconstitutionally automatic aggravating circumstance (the felony murder aggravator); (8) the heinous, atrocious, or cruel (HAC) aggravator is vague and overbroad; (9) the cumulative effect of trial counsel errors denied Pooler effective assistance of counsel; (10) the sentencing court erred by failing to properly and timely impose a written sentence of death; (11) the rule prohibiting juror interviews is unconstitutional; (12) trial counsel failed to investigate the forensic evidence or retain a forensic expert; (13) the trial court erred in permitting the State to introduce gruesome photographs; (14) Pooler is innocent of the death penalty; (15) Florida's death penalty statute is unconstitutional because it fails to prevent the arbitrary and capricious imposition of the death penalty; (16) Pooler's convictions and death sentences were obtained in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). The trial court conducted an evidentiary hearing on claims one, two, and six.
[3] Although the law has since changed, see § 775.051, Fla. Stat. (1999), voluntary intoxication was an available defense to negate specific intent at the time of the killing in this case. See Gardner v. State, 480 So.2d 91 (Fla.1985).
[4] Pooler's amended rule 3.850 motion was filed on March 13, 2000, before the rule was changed. See generally Fla. R.Crim. P. 3.851(a) ("This rule . . . shall apply to all postconviction motions filed on or after October 1, 2001, by prisoners who are under sentence of death. Motions pending on that date are governed by the version of this rule in effect immediately prior to that date."). Therefore, we analyze Pooler's claims under the summary denial standard set forth in rule 3.850(d).